TIBBY v. THE MISSOURI PACIFIC RAILWAY COMPANY, *Appellant.*

1. **Negligence** : RAILROADS: USAGE: PASSENGER. It is competent for the plaintiff to show the usage of a railroad to transport its stock passengers on the top of its train, along the place of the accident, in an action against it for the death of plaintiff's husband, by negligence, who was, at the time of the injury, a passenger on its stock train and on top of one of its cars, and was thrown therefrom by the concussion resulting from the locomotive removing the slack of the train, preparatory to pushing it forward, and was killed.

2. **Railroads** : PASSENGER: DEGREE OF CARE Where a railroad undertakes to transport a stock passenger on the top of its train, it must manage and run the train with skill and prudence in order to prevent him from being thrown off. The degree of diligence and care in running and managing the train, must correspond in a measure with the mode of conveyance adopted by the company and the person to be conveyed.

3. **Common Carriers :** NEGLIGENCE. A common carrier is not permitted to stipulate against its own negligence. Especially is this true in its carriage of passengers.

*Appeal from St. Louis Court of Appeals.*

AFFIRMED.

*E. A. Andrews* and *Robert Adams* for appellant.

It was error to permit the proof of the custom of stockmen to ride on the top of the cars. Such custom was not alleged in the petition, nor brought home to the knowledge of the deceased. The direction of the conductor to leave the caboose and go forward and get into a box car, was not the proximate cause of the injury. "The spontaneous action of an independent will intervened between the expulsion from the car and the injury." *Henry v. Railroad Co.*, 76 Mo. 294; Wharton on Neg., 200, §§ 134, 138; *Haley v. Railroad Co.*, 21 Ia. 15; *Forsyth v. Railroad Co.*, 103 Mass. 510; *Frost v. Railroad Co.*, 10 Allen 387; *Penn. R. R. Co. v. Zebe*, 33 Pa. St. 318; *Bancroft v. Railroad Co.*, 97 Mass. 275; *L. S. & M. S. R. R. Co. v. Hart*, 87 Ill. 529; *B.*

*& P. R. R. Co. v. Jones*, 95 U. S. 439; also *Nelson v. Railroad Co.*, 68 Mo. 593. The court erred in overruling defendant's demurrer at the close of plaintiff's case. It was error for the court to refuse to admit the stock contract offered in evidence by defendant, and which entitled deceased to ride on defendant's trains.

*Britton A. Hill, T. J. Delaney* and *A. R. Taylor* for respondent.

This action is based upon the negligence of the carrier, and this cannot be stipulated against. *Graham v. Railroad Co.*, 66 Mo. 536; *Railroad v. Lockwood*, 17 Wallace, 357; *Railroad v. Stevens*, 95 U. S. 655; *Sturgeon v. Railroad Co.*, 65 Mo. 569; *Clark v. Railroad Co.*, 64 Mo. 447. This is the settled law of this State. Hence, the contract with Tibby was properly excluded by the court. It was entirely correct to show that the manner in which the defendant carried stockmen as passengers from Twenty-first street to the end of the journey, was on top of box cars, in order to show that Tibby was properly on top of the box car when knocked therefrom by defendant's negligence and killed. Hence, the admission of the testimony of the witnesses to show this fact was clearly right. The instruction given by the court, required the jury to find that Tibby's death was occasioned by the negligence of defendant's servants whilst managing its trains, before they could render a verdict against defendant. The instruction put the case to the jury upon the facts, and is beyond criticism. The point made by appellant, that the direction of the conductor to leave the caboose, and go forward, to get on or in a box car, was not the proximate cause of the injury, is too obscure to be understood. Nobody ever contended that such direction was the proximate cause. The proximate cause of the injury was the reckless negligence of defendant's servants, in causing the different portions of the train

to be struck together with such force as to cause the stock passenger to be knocked off the train.

MARTIN, C.—This was an action under the statute to recover damages for an injury resulting in the death of plaintiff's husband.    It is alleged in the petition that the defendant accepted Matthew Tibby, husband of plaintiff, as a passenger on its train, laden with live stock, and undertook to carry him safely from Sedalia to St. Louis at its union depot; that in pursuance of such undertaking defendant carried said Matthew as far as Twenty-first street in St. Louis where defendant by its servants directed said Matthew to leave the caboose car in which he had ridden as passenger thus far on his journey, and to get upon the top of a car of said train to be there carried to the end of his said journey; that in pursuance of said direction said Matthew did get upon the top of a car of said train to be there carried to the end of his journey; that while said Matthew was on the top of said car the agents and servants of defendant in charge of its said train did carelessly and recklessly cause said train, while it was moving eastward, to be suddenly and violently slacked up, whereby said Matthew, without any fault or negligence on his part, was violently thrown from said car in front of said train where the wheels of the cars passed over him, inflicting such injuries upon him that death resulted therefrom.

The defendant answered by denying the facts alleged in the petition and charging contributory negligence on the part of plaintiff.    The trial resulted in a verdict of $5,000 for plaintiff, from which the defendant has appealed, accepting an affirmance *pro forma* in the St. Louis court of appeals.

It appears from the evidence that Matthew Tibby was the husband of plaintiff and that he was accepted at Sedalia as a person in charge of stock on board of the train to be transported to St. Louis at its union depot.    The accident which resulted in his death is graphically stated in the ev-

idence of Peter J. Hudson, a fellow traveler, who was an eye-witness, as follows:

"I reside in Neosho county, Kansas; I was acquainted with Matthew Tibby in his lifetime; I knew him on or about the 16th day of June, 1879; I was with him in St. Louis, Missouri, on Twenty-first street at that time, the 16th day of June, 1879; we started from here, from Osage, Missouri, on the night of the 14th day of June, 1879; we started from depot with stock; we reached St. Louis June 16th, 1879, about 5 o'clock in the morning, met after 5 o'clock in the morning. The weather was rather misty and foggy on that morning; it was just getting daylight when we arrived in St. Louis; it was not daylight yet, not light as it is now; we were on the Missouri Pacific Railroad. When we got at Twenty-first street in St. Louis, the train stopped there; the conductor said that was as far as the caboose went, that we would have to go through the tunnel in a box car, up next to the engine. There was some four or five of us in the caboose at the time; Mr. Tibby, Mr. Welsh and myself got out of the caboose and started for the front of the train; they went out on the left-hand side; they were rather ahead of me; I was on the opposite side of the train from them, going along looking at the hogs I had charge of, trying to see how many there were dead; and when I got to the front end of the train they were on top of the front stock car and motioned to me to come up. They said there would be a box car in there to go through the tunnel in. When I got up on top of the car I went up to where they were standing; I sat down about four or five feet from the front end of the car; had not been sitting there but about a minute and the engine came in from the rear and struck the rear end of the train and gave a very hard jar. Mr. Tibby was in the act of sitting down when the jar came. He, Tibby, standing to my right at that time, and Mr. Welsh to my left, one on each side of the foot board on the top of the car; I was sitting on this board. When the jar came it threw me in the same direc-

tion it did Mr. Tibby and Mr. Welsh; we all went together when the jar came, and Mr. Tibby went so far he could not catch his balance; I expected to see Mr. Welsh go at the same time, but he did not; I think as Mr. Tibby saw he had lost his balance he went to jump; he lit, I suppose, about four feet ahead of the car. Mr. Welsh, who was standing up hallooed at him to get out of there quick. He, Welsh, turned around and said, my God; and by the time he said this the wheels were going over Mr. Tibby. I got down off the cars; by the time I got around to where Mr. Tibby was, there was two or three men there to take Mr. Tibby out; they had to start the train backward in order to get his body out, as it was under the truck, and they could not get it out without moving the train; he lived about five minutes after he was taken out; they sent for an ambulance. The train we were on consisted of about eighteen or twenty cars; we were on the east end of the train when he was killed; it was standing still when we got up there; the locomotive struck the west end of the train; I did not see any box car in front of us; the engine was cut off; I saw the train as it was moving away; I did not see any empty box cars in front, I could not see any; Mr. Welsh and one of the other stockmen was on the cars when the train moved away; Mr. Welsh was standing on the top of the car from which Tibby was thrown, as the train went away; I can't say how Mr. Tibby and Welsh came to be on top of the train; they were there when I got there; at the time I got upon the car where Tibby was, there was another man on the top of the train, about the middle of the train; I suppose he was a stockman; it was one of the men I saw in the caboose; he was not a train man; I think at the time of the jar, Tibby was on the right of me and Welsh was on the left, a little in front of me, not much forward of me; I was sitting down, Welsh was standing up erect and Tibby was rather in the act of sitting down; I was not expecting such a blow; the blow threw me forward about half way over; I had my

grip sack down there and that did not not let me go as far as I would; I threw my hand forward on the car to stop or prevent my falling over. The jar threw Mr. Welsh pretty close to the edge of the car; I thought it was a pretty heavy blow, heavier than usual while coupling cars; it made the cars rattle considerable. One pair of trucks ran over Mr. Tibby, and the first wheel of the second pair was standing on him. This was my first trip as a stockman."

The plaintiff submitted in evidence the testimony of A. Letcher and M. L. Fox who were stockmen; also, the testimony of John O'Leary, a coal dealer, and resident near 21st street, and of John W. Campbell, a sergeant of police, all of whom were familiar with the way in which the defendant transported stockmen as passengers from Twenty-first street to the Union depot. According to their concurring evidence it had been the usage of the company for many years to cut off the caboose car containing the stockmen as soon as the incoming train reached High or Twenty-first street; the men in charge of their stock were then required to get upon top of the train for the purpose of completing their journey to the Union depot, or the tunnel; there were no seats on top of the cars and the men being transported either stood up or sat upon what is known as the foot board, that is the board about ten inches wide running the length of the top of the car in the center thereof, upon which the employes of the train pass to and fro on the top of the train. This was the only accommodation furnished by defendant for the transportation of stock passengers from Twenty-first street to the Union depot or to the point at which the transfer lines meet the train to carry it through the tunnel. They either had to ride in this manner or walk the distance of about half a mile over a net-work of railroad tracks occupied with moving trains. This evidence was all objected to by defendant.

On the part of defendant, the only evidence produced consisted of the contract usually existing between the com-

pany and stock passengers. This contract was signed by Matthew Tibby as a passenger in charge of stock, and contained a clause reciting that in consideration of a free passage over the road the company should be exempt from liability for any injury suffered by him on the road while in charge of his stock. On objection of plaintiff this contract was excluded from the jury. The defendant then asked an instruction in the nature of a demurrer to the evidence and pleadings which was refused. Defendant, also, asked the court to instruct the jury to exclude from their consideration all testimony showing, or tending to show the custom or manner in which any other person than deceased rode upon defendant's stock trains; which request was refused. On the part of plaintiff the court gave the following instruction:

The court instructs the jury, that if they find from the evidence in this case, that on or about the 15th day of June, 1879, the defendant was a common carrier of freight and passengers between Sedalia, Missouri, and St. Louis, Missouri, and that on said day the defendant accepted Matthew Tibby as a passenger upon its car used and operated by defendant, to be carried by defendant as such passenger, from Sedalia, Missouri, to St. Louis, Missouri, and if the jury believe from the evidence that defendant did carry said Matthew Tibby as such passenger on its said train to Twenty-first street in St. Louis, Missouri, on the line of defendant's railway, and that defendant there required said Matthew Tibby to leave the car on which he had ridden thus far on his journey, and to get upon the top of one of the cars operated by defendant, to be thus carried to the end of his destination as such passenger. And if the jury believe from the evidence that whilst said Matthew Tibby was upon the top of said car, he was thrown from the said car and killed without negligence on his part, and if the jury believe from the evidence that said Matthew Tibby was so thrown from said car and killed, through the negligence or unskillfulness of defendant's agents, servants

or employes, whilst running, conducting or managing said train of cars, in causing said train whilst moving to be stopped with a sudden jerk or shock; and if the jury believe from the evidence that Rachael Tibby was the lawful wife of Matthew Tibby at the time of his death, then the jury should find for the plaintiff in the sum of $5,000.

The jury then rendered the verdict appealed from.

In reviewing the record it is unnecessary to consider anything outside of the points urged by defendant for a reversal of the judgment. It is objected that the court erred in admitting the evidence relating to the prevailing usage of the company in transporting its stock passengers from Twenty-first street to the Union depot in St. Louis. This objection is not well taken. It was competent to prove this usage in order to overcome any inference of contributory negligence on the part of the deceased in being in such an exposed place as the top of the train. Presumably this was no place for a passenger to be. But he was in a proper place if this was the only place provided by the company for his accommodation. Moreover, if this was the place in which the defendant was in the habit of transporting its stock passengers, the deceased was properly there along with the other stock passengers without any express direction of the defendant to go there. The usage operated as a standing license to be there, in the absence of an express order or direction to the contrary. In this view of the case, an express direction to the deceased to go there was superfluous. I will not stop to consider the point, as to whether the company had an actual knowledge of its own usages. Again, it was competent in support of the allegation of an express order or direction to go there. The witness, Hudson, testified that the conductor said " that was as far as the caboose went, that we would have to go through the tunnel in a box car up next to the engine." On cross-examination the witness reports the conductor as saying " we must get out of the caboose and go

forward and get in a box car and go through the tunnel." The usage shows to what place forward he was thus directed to go in order to board the box car when it came to the train or the train came to it preparatory to entering the tunnel. The usage explains the direction he received and goes to support the allegation in the petition that he took his place on top of the train in pursuance of an express direction to that effect. No good reason is urged in support of a demurrer to the case as made in the evidence and pleadings.

The character of conveyance provided by defendant for transporting the deceased, was before the jury, and it was for them to determine whether it was reasonably safe or not. Having undertaken to transport him on the top of the train, along with other stock passengers, it was their duty to manage and run the train with skill and prudence in order to prevent him from being thrown off. The degree of diligence and care in running and managing the train had to correspond, in a measure, with the mode of conveyance adopted by the company, and the person or thing to be conveyed. There might be great negligence in subjecting a train, conveying passengers on top of the cars, to certain jerks and bumps which could not affect the safety of passengers transported in inclosed cars. All the facts disclosing the mode of conveyance and the way in which the train was managed at the time of the accident, were given to the jury. They found that the deceased lost his life by the negligent acts of the defendant, and as the evidence contained facts from which negligence could reasonably be inferred, no relief can be expected in an appellate court from the effect of their verdict.

The contract of exemption from damages was properly excluded. A common carrier is not permitted to stipulate against its own negligence. *Clark v. Railroad Co.*, 64 Mo. 447; *Sturgeon v. Railroad Co.*, 65 Mo. 569; *Graham v.*

*Railroad Co.*, 66 Mo. 536. This rule in its application to the carriage of passengers, has never been relaxed.

The judgment is affirmed. All concur, except NORTON and SHERWOOD, JJ., absent.